33914. LIBERTY MUTUAL INSURANCE COMPANY *et al. v.* HARDEN.

FELTON, J. 1. The Court of Appeals may set aside an order or decree of the Directors of the Workmen's Compensation Board if there is not sufficient competent evidence in the record to warrant the directors in making the order or decree complained of, or if the order or decree is contrary to law. Code, § 114-710.

2. "In order for a death to be compensable to a dependent under the provisions of the Workmen's Compensation Law, it must result instantly from an accident arising out of and in the course of employment, or later result proximately therefrom; and the burden of proof is on the claimant to show that the death so resulted." *Johnson* v. *Fireman's Fund Indemnity Co.,* 79 *Ga. App.* 187 (1) (53 S. E. 2d, 204). Therefore, in the instant case, the claimant had the burden of proving that the skull fracture received by her husband in his fall on October 26, 1948, proximately caused the "embolism or blood clot to the left lung" which resulted in his death on September 19, 1950; and, since even that testimony of the medical witnesses most favorable to the claimant was problematical and conjectural, the claimant failed to carry such burden of proof; and, further, the claimant's evidence at its best was consistent with either of two opposing theories and therefore proved neither *(Federal Reserve Bank of Atlanta* v. *Haynie,* 46 *Ga. App.* 522 (1), 168 S. E. 112; *Taylor* v. *State,* 44 *Ga. App.* 387, 417, 161 S. E. 793; *American Mutual Liability Ins. Co.* v. *Harden,* 64 *Ga. App.* 593, 595, 13 S. E. 2d, 685); and the court erred in affirming the award of the full board.

*Judgment reversed. Sutton, C.J., and Worrill, J., concur.*

DECIDED MARCH 19, 1952—REHEARING DENIED APRIL 2, 1952.

*Neely, Marshall & Greene,* for plaintiff in error.
*E. B. Shaw,* contra.

Clara Harden filed a claim against Ray M. Lee Company and its insurance carrier, Liberty Mutual Insurance Company, under the Workmen's Compensation Act for death benefits allegedly arising out of the death of her husband. On October 26, 1948, the claimant's husband, Fred Harden, fell from a scaffold while in the employment of Ray M. Lee Company and received certain

head injuries. Under an agreement filed with and approved by the Workmen's Compensation Board, Fred Harden was paid compensation at the rate of $20 a week for and during a period of 26 weeks, beginning November 2, 1948, and continuing to May 9, 1949, on which date he signed a final settlement receipt. On September 19, 1950, Harden died. The single director found that Harden's death was due to the accident which arose out of and in the course of his employment with Ray M. Lee Company and based an award thereon.

At the hearing, Dr. Linton Smith testified on behalf of the claimant as follows: that he treated Fred Harden only one time, and that was on April 14, 1949; that he diagnosed the deceased's trouble as paraplegia, that is, paralysis on one side; that this was the reason the deceased came to him; that he did not have very much record on the deceased, but his only record showed that his diagnosis was paraplegia and a cerebral hemorrhage; that he did not have any opinion as to what caused the deceased's condition; that the deceased also had arteriosclerosis at the time; that he did not have any recollection of the deceased's discussing a fall with him; that "all I have is my very brief history from him"; that in his opinion a severe concussion on the right side of the brain from a fall of fifteen feet, resulting in a skull fracture would tend to aggravate his condition; that it could cause paralysis and cerebral hemorrhage; that it could not cause congestion of the liver and could not aggravate a heart condition; that there was conceivable as a bare possibility, but a very bare possibility, that such a fall could cause blindness; that such a fall could not have affected his blood pressure; that the deceased had a very high blood pressure and arteriosclerosis, but the fall would not have caused that, it might have caused the fall; that high blood pressure and arteriosclerosis are by far the most common causes of paralysis; that he did not treat the deceased for the fall but on account of paralysis; that arteriosclerosis and high blood pressure are diseases of the blood vessels and usually go hand in hand; that a fall would not have aggravated the blood pressure or arteriosclerosis, but that these could be responsible for a person's falling; that a person suffering from these diseases is likely to fall at any time; that a person suffering with high blood pressure and arteriosclerosis can have a cerebral hem-

orrhage without having a fall at all, and that most people have a cerebral hemorrhage without any injury at all; that high blood pressure is a gradual process and does not develop suddenly; that the symptom, paralysis, comes on suddenly, but the blood pressure is built up gradually; that he could not say or express any opinion either way as to whether the fall shortened the life of the deceased or aggravated his condition. "Q. I am asking the hypothetical question that, if he had an injury in October of 1949, which was approximately six months before you saw him, and he died in September of 1950, which was approximately a year and four months after you saw him, before you could express any opinion as to any question or relation between the fall and the death, you would have to know first how he was injured in the fall, whether he recovered from the fall, and you would have to know the diagnosis made on the autopsy, before you could correctly answer the question as to whether or not the fall caused his death? A. Yes, I would."

Dr. J. L. Austin testified in behalf of the claimant substantially as follows: that he examined the deceased on August 5, 1950; that the deceased's complaint was blindness; that he diagnosed optic atrophy; that the deceased had only light perception in each eye and that he suggested that the deceased consult a neurosurgeon; that the symptoms suggested blindness caused by disease of the eye, paropsia; that in his opinion the lesion was centralized in the eye itself; that it was possible for a blow on the head to cause blindness if there was a blood clot which usually accompanies a fractured skull; that he was convinced that some disturbance in the deceased's brain was causing his blindness; that, in order to determine the cause of the central lesion, one would have to make a study of the brain itself, and that this was the reason he sent the deceased to a neurosurgeon; that it was likely the fall caused the central lesion; that to the extent of his examination he could only say that in his opinion the lesion was central; that he could not say as to the probable cause from the fall. "Q. You do not at this time express any opinion as to any relation between this fall and death? A. No, sir. Q. You are merely testifying to the fact that the injury could have caused a central lesion, and the central lesion was the cause of his blindness? A. Yes, sir. Q. You gave that evi-

dence solely on the question of the blindness? A. Yes, sir. Q. And not in respect to the question of his death? A. No, sir."

Dr. F. P. King testified on behalf of the claimant substantially as follows: that he performed an autopsy on the deceased; that the autopsy disclosed that the deceased had marked softening in the cephalo, malatia of the right and left side of his brain, marked hardening or arteriosclerosis of the arteries of the brain, embolism in the left lung artery, a healed scar in the heart; that there was also evidence of an old and healed fracture of the right side of his skull; that there were other findings which did not contribute to the death; that it was unlikely that the fall contributed to his death, but, however, it might have; that it was difficult to deny it, since the injury and the death were such a long interval from one another; that in his opinion the deceased's death was definitely due to an embolism or blood clot in the left lung; that his statement after the autopsy was: "although it cannot be stated with certainty, it seems likely that the brain disease was secondary to the vascular disease. In other words, I indicated that in all likelihood the fracture had nothing to do with the brain disease. However, I did not make a dogmatic statement about and still feel that one cannot be dogmatic"; that the only thing a doctor can do is to form an opinion. "Q. You will admit, doctor, that this fall did not lengthen his life, won't you, doctor, it didn't assist him, it didn't strengthen him any? A. It is not likely that it caused him to live longer than he might have. However, the fact is that he had marked hardening of his arteries leading to his heart, and that condition may be aggravated by heavy exertion which he was prevented from doing and the bed rest or the rest that he was forced to undergo may have prevented his heart disease from precipitating any serious illness or death."

Dr. Rufus A. Askew testified on behalf of the defendants substantially as follows: that when the deceased was brought to the hospital following his fall, he was in a critical condition and was not expected to live; that the X-rays revealed that he had a large fracture on the right side of his head involving mostly the right parietal bone; that on the following day he and Mr. Lee agreed to have Dr. Edgar Fincher, a brain specialist, attend the deceased for the purpose of examination; that Dr. Lewis Mc-

Donald was also called in on the case; that they had a consultation on the deceased, which resulted in the opinion that the deceased had suffered a stroke on the left side of the brain; that it was his opinion that the deceased should be treated conservatively without an operation; that after three or four days of such treatment he began to improve somewhat; but that the deceased had a total paralysis of the right side of the body, which was conclusive proof to the doctors that he had a left-sided hemorrhage which was believed to be the result of vascular disease; that he was treated until December 4, when he was dismissed; that during this time the witness was able to ascertain that the deceased had advanced vascular disease; that he had a blood pressure of usually above 240; that after his dismissal from the hospital the deceased's blood pressure came down slightly but remained quite high; that the deceased had symptoms of a long vascular disease, and that an optomoscopic examination disclosed marked evidence of arteriosclerosis; that he continued to treat the deceased at his office until May 9, 1949, at which time he dismissed him as being recovered from the injury; that he still had marked vascular disease, but had recovered from the injury he sustained on October 26, 1948; that after his dismissal the witness never saw the deceased again; that he agreed with Mr. King that the rest in bed after the fall would have been helpful to the deceased rather than harmful; that the fracture, which was not depressed, did not have any causal connection with the death; that, while the deceased was definitely injured and the injury would definitely aggravate the condition at the time, the deceased recovered from the aggravation but not from the illness; that it was his opinion that the deceased had a stroke while working on the scaffold, and that he fell striking the right side of his head, inflicting a skull fracture; and that the entire neurological picture would reveal the condition as being such.

There was some evidence that the scaffold tipped over slightly, causing the deceased to fall.

The full board affirmed the award of the single director. On appeal, the Superior Court of Fulton County affirmed the award, and Ray M. Lee Company and its carrier excepted.